IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ODEL RUDY VERCELLI, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO. 1:11cv944 ) ) |
| WORLD COURIER, INC., | ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendant World Courier, Inc.'s ("World Courier") Motion for Summary Judgment. (Dkt. No. 20.) This case concerns Plaintiff Odel Rudy Vercelli's discriminatory discharge claim against his former employer World Courier under the Age Discrimination in Employment Act ("ADEA"). The issue before the Court is whether the Court should grant World Courier's Motion for Summary Judgment where (1) Mr. Vercelli, the manager of World Courier's D.C. office, was terminated after a series of errors concerning international shipments from the D.C. office took place; (2) World Courier stated that it terminated Mr. Vercelli's employment because of his poor job performance, which related to the shipment errors; (3) Mr. Vercelli offers no evidence, other than his own suspicion, that he was terminated because of his age; and (4) Mr. Vercelli's supervisor, who knew Mr. Vercelli's advanced age when hiring him, terminated his employment sixteen months later.

The Court grants World Courier's Motion for Summary Judgment because Mr. Vercelli cannot establish a *prima facie* case of age discrimination under the ADEA as he cannot prove by a preponderance of the evidence that he was performing his job duties at a level that met World

Courier's legitimate expectations. Even if Mr. Vercelli established a *prima facie* case, he cannot establish that World Courier's stated nondiscriminatory reason for the adverse employment action was pretextual because Mr. Vercelli cannot show that between his age and World Courier's reason for the termination, age was the more likely reason for the dismissal, or that World Courier's proffered explanation is simply not credible. Additionally, the fact that the same person who allegedly discriminated against Mr. Vercelli is the person who hired him sixteen months earlier supports World Courier's argument that its nondiscriminatory reason for the termination is not pretextual.

## I. BACKGROUND

This is an age discrimination case. In February 2009, Michael Connolly, Director of U.S. Operations for World Courier, hired Mr. Vercelli, who was in his seventies, as station manager for the company's Washington, D.C. office. Mr. Connolly was aware of Mr. Vercelli's advanced age when he hired Mr. Vercelli. Afterwards, the D.C. office started handling international shipments. However, there were a series of problems with international packages from the D.C. office that caused a negative impact on World Courier's operations. Mr. Connolly repeatedly communicated with Mr. Vercelli about the errors and provided him with instructions for fixing the errors. Additionally, World Courier arranged an on-site training for employees in the D.C. office, focusing on international transactions. Nonetheless, another similar error occurred after the training. Subsequently, Mr. Connolly terminated Mr. Vercelli's employment in June 2010 and replaced him with someone who was twenty-eight years old. Mr. Vercelli filed this action against World Courier under the ADEA alleging that the termination was based on his age.

In June 1992, Mr. Vercelli began working as a driver, independently contracted to deliver and pick up packages in the Washington D.C. area for World Courier, a New York corporation. At the time Mr. Vercelli started with the company, World Courier did not have an office space in the D.C. area. Mr. Vercelli received his delivery assignments directly from his supervisor located in the New York office.

In early 2008, Mr. Connolly began planning to open the Washington, D.C. area office. In October 2008, Mr. Connolly arranged training for Mr. Vercelli in World Courier's New York office on the company's software programs, including WorldStar, OpStar, and PC Pro. Specifically, World Courier trained Mr. Vercelli for a day and a half in operations on how WorldStar works in practice. World Courier also provided demonstrations to Mr. Vercelli on how to use OpStar.

In February 2009, knowing Mr. Vercelli's advanced age of seventy-four to seventy-five, Mr. Connolly hired Mr. Vercelli as an employee of World Courier and promoted him to the position of station manager of the Washington, D.C. office. Mr. Vercelli's managerial responsibilities included (1) overseeing the operations in the D.C. office; (2) having knowledge about the detailed specifications of delivering packages of all kinds for World Courier; (3) supervising the employees in the D.C. office, evaluating their performance, and training, counseling and/or disciplining them; and (4) ensuring that the drivers and the dispatchers were accurately and punctually delivering and picking up the packages.

After Mr. Vercelli became a manager, the D.C. office started handling international deliveries, and Mr. Vercelli oversaw the employees who were completing the documentation for international shipments. World Courier used VEX tags to mark shipments to London. As the

manager, Mr. Vercelli had to make sure that the packages that were being delivered out of the D.C. office had all the appropriate information on the VEX tags.

From September 2009 to April 2010, several incidents took place in the D.C. office concerning international packages bound to London. On September 16, 2009, employees in the D.C. office missed consignment instructions for a shipment which would indicate the value of the package. Mr. Connelly expressed his concern to Mr. Vercelli about the error via an email. (Def.'s Mem. in Support of Mot. for Summ. J., Ex. 8) [hereinafter Def.'s Ex. 8] ("[T]here was no value indicated . . . in WorldStar . . . but . . . the shipment was . . . manifested with a $0 value. The actual value per the shippers invoice was $30,000"). On September 17, 2009, Mr. Connelly sent Mr. Vercelli the missing consignment instruction via email. (Def.'s Ex. 8) ("Here is the consignment instruction that was overlooked by your staff.").

On or about October 30, 2009, three shipments from the D.C. office to London contained multiple errors which caused a minimal delay. On or about November 16, 2009, a shipment from the D.C. office arrived at the airport late causing a delay in the shipment to London. Mr. Connelly emailed Mr. Vercelli and inquired about the delay: "Have you had an opportunity to review this shipment? It was apparently delayed because [the D.C. office] tendered late on day one and was missing a required statement . . . . Can you let me know what happened?" (Def.'s Mem. in Support of Mot. for Summ. J., Ex. 10.)

On February 3, 2010, a shipment from the D.C. office had an improperly marked VEX tag causing a delay in the delivery. On the same day, Mr. Connelly emailed Mr. Vercelli:

> I suspect that [the] concern is that you marked the VEX tag as a dutiable commodity "H" which was correct . . . but in that case, you cannot send as "documents." It should have been indicated on the VEX bill as "marketing material" which is dutiable . . . . Additionally, the VEX number was indicated

4

incorrectly. Please see the explanation in Optiview. (Def.'s Mem. in Support of Mot. for Summ. J., Ex. 11.) Furthermore, on or about February 23, 2010, another shipment from the D.C. office had an improperly marked VEX tag. Subsequently, the customs officials in London's Heathrow International Airport advised that any further errors on World Courier's shipments would result in a hold on all shipments by World Courier. In response, World Courier stopped all direct exports out of the D.C. office because "[World Courier] didn't feel [it] could afford another error that might potentially jeopardize [its] office and London's ability to clear shipments." (Def.'s Mem. in Support of Mot. for Summ. J., Ex. 13.)

Before Mr. Connolly allowed the Washington, D.C. office to resume sending shipments to London, Alvin Manbodh of the New York office came to train the employees in the D.C. office for a week in March. The training focused on working with the company's systems to process international transactions. However, Mr. Vercelli did not participate in the training because of "other obligations during that period with respect to managing the office, including matters out of the office." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 5.)

After the training, on or about March 30, 2010, the VEX tag of another shipment from the D.C. office to London was improperly marked. On April 5, 2010, Mr. Connolly forwarded a March 30, 2010 email from the New York office to Mr. Vercelli which noted that "wrong or no valuation markings seem to be a regular occurrence from [the D.C. office]" and that "[f]uture shipments [would] be detained by customs." (Def.'s Mem. in Support of Mot. for Summ. J., Ex.15.) [hereinafter Def.'s Ex. 15.] Accompanying the forwarded email, Mr. Connolly asked Mr. Vercelli, "[w]ere you made aware that we had another marking/labeling issue with a London export??" (Def.'s Ex. 15.) Later that day, Mr. Connolly again emailed Mr. Vercelli:

5

> The instructions are in OpStar. I don't understand your explanation that "you were never instructed in advance to avoid the problem"??
>
> Is there some misunderstanding between a low value dutiable item, and a document?
>
> This shipment has a document service type and an item description as documents, why would it not have been tagged as a document?
>
> Given that there have been several errors of this nature to London, and the fact that we have been warned repeatedly by UK Customs, why would this not have received additional attention? If there was some confusion, was there a call made to someone in New York for help?
>
> Did you personally review the shipment prior to tender?

(Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. 5.) [hereinafter Pl.'s Ex. 5.] Subsequently, Mr. Connolly decided to terminate Mr. Vercelli. By mid-April, Mr. Connolly offered Mr. Manbodh Mr. Vercelli's position, and Mr. Manbodh accepted the job within two days. On June 15, 2010, Mr. Connolly terminated Mr. Vercelli's employment because (1) he did not like the way the office is running; (2) that there were errors with shipments to London; and (3) Mr. Vercelli was not practical with computers. Mr. Connolly also denied Mr. Vercelli's request to continue working for the company as a driver. Mr. Manbodh started working on June 16, 2010.

Mr. Vercelli brought this lawsuit against World Courier on September 6, 2011. The Complaint contains only one count – Discrimination in the Termination of Employment in Violation of the ADEA. Defendant World Courier's Motion for Summary Judgment is now before the Court.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). In reviewing a

motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248. Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III. ANALYSIS

The Court grants summary judgment in favor of Defendant and against Plaintiff for two reasons. First, Plaintiff cannot establish a *prima facie* case under the ADEA. Specifically, Mr. Vercelli cannot demonstrate that he was performing his job duties at a level that met his employer's legitimate expectations because there were repeated problems with international

shipments that were shipped out of the D.C. office to London. Second, even if Mr. Vercelli had established a *prima facie* case, he cannot prove by a preponderance of the evidence that Defendant's reason for the adverse employment action was pretextual because Mr. Vercelli cannot show that between his age and World Courier's reason for the termination, age was the more likely reason for dismissal, or that World Courier's proffered explanation is simply not credible. Specifically, there is no evidence demonstrating that age was a factor in Mr. Connolly's decision to terminate him. Additionally, the fact that Mr. Connolly, who was fully aware of Mr. Vercelli's advanced age when hiring him, terminated him sixteen months later suggests that World Courier's nondiscriminatory reason for the termination is not pretextual.

To establish a claim under the ADEA and to avert summary judgment, a plaintiff must prove by a preponderance of the evidence that age was the "but for" cause of his discharge. *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 178 (2009). A "but for" motive can be established in one of two ways. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 940 (4th Cir. 1992). "The plaintiff may meet this burden under the ordinary standards of proof by direct or indirect evidence relevant to and sufficiently probative of the issue." *Id.* A plaintiff may show "(1) that he was an employee covered by the ADEA [40 years old or older]; (2) he suffered an unfavorable action by an employer covered by the ADEA; and (3) age was a determining factor, meaning that but for the employer's motive to discriminate against him on the basis of age, he would not have been subject to that unfavorable action." *Davis v. Old Dominion*, 755 F. Supp. 2d 682, 705 (E.D. Va. 2010).

Alternatively, the plaintiff may resort to the judicially created indirect proof scheme, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This scheme has been adapted to ADEA

cases. *Clay Printing Co.*, 955 F.2d at 941 (citations omitted).[1] Under the *McDonnell Douglas* framework, a plaintiff may overcome summary judgment by, first, presenting a *prima facie* case of age discrimination consisting of four elements: (1) the plaintiff is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

After plaintiff establishes a *prima facie* case under the ADEA, the burden shifts to the defendant to rebut the presumption of discrimination by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dep't*, 450 U.S. at 252–53 (quoting *McDonnell Douglas*, 411 U.S. at 802). "The employer is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *EEOC v. W. Elec. Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983) (citing *Smith v. Univ. of North Carolina*, 632 F.2d 316, 332–33 (4th Cir. 1980)). The defendant's burden is simply a burden of production, not of persuasion. *Texas Dep't*, 450 U.S. at 255.

If the defendant is successful in carrying his burden of production, the plaintiff must demonstrate by a preponderance of the evidence that defendant's reasons were a pretext for discrimination. *Id.* at 252–53. The burden of persuasion remains with the plaintiff throughout. *Id.* at 256. To demonstrate that defendant's proffered reason was a pretext, plaintiff "must show that as between the plaintiff's age and the defendant's explanation, age was the more likely reason for the dismissal, or that the employer's proffered explanation is simply unworthy of credence." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citations omitted). Additionally, the Fourth Circuit recognizes a "same actor" inference that presumes that an

---

[1] The parties agree that the *McDonnell* framework applies in this case.

employer's stated reason for acting against an employee is not pretextual when the employee was hired and fired by the same person within a relatively short time span. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

### 1. *Mr. Vercelli Fails to Meet His Employer's Legitimate Expectations*

The Court grants summary judgment in favor of World Courier on Mr. Vercelli's age discrimination claim because Mr. Vercelli failed to meet one of the elements for a *prima facie* case under the ADEA: performing his job duties at a level that met his employer's legitimate expectations. The parties do not dispute that Mr. Vercelli's age discrimination case meets three of the four required elements under the ADEA. First, Mr. Vercelli is a member of a protected class because he is over forty years of age. Second, Mr. Vercelli did suffer adverse employment action when he was terminated from his position at World Courier. Third, Mr. Vercelli's position was filled by someone outside the protected class, a twenty-eight year old. However, Mr. Vercelli cannot establish that he met World Courier's legitimate expectations. With respect to the element concerning Plaintiff's job performance, it is the perception of the decision maker that is relevant to whether the employee met the employer's legitimate expectations at the time of termination. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006).

Here, the record shows that Mr. Connolly, who hired and supervised Mr. Vercelli, was not satisfied with Mr. Vercelli's job performance at the time he decided to terminate Mr. Vercelli's employment. Mr. Vercelli acknowledges that from September 2009 to April 2010 at least five incidents took place where employees who were managed by Mr. Vercelli in the D.C. office failed to properly process packages to London. Mr. Connolly emailed Mr. Vercelli several times to bring these errors to Mr. Vercelli's attention. He also sent Mr. Vercelli instructions as

well and related information to fix the problem.[2]

On or about February 23, 2010, due to the fact that a series of shipments from the D.C. office had an improperly marked VEX tag, the customs officials in London's Heathrow International Airport advised that any further errors on World Courier's shipments would result in a hold on all World Courier shipments. This warning from London prompted World Courier to suspend direct exports out of the D.C. office. On the next day, Mr. Connolly arranged a one-week training for the employees in the D.C. office, which focused on working with the company's systems to process international transactions.

After the training, yet another similar shipment error occurred on or about March 30, 2010. After learning of Mr. Vercelli's March 30, 2010 error, Mr. Connolly emailed Mr. Vercelli on April 5, 2010:

> The instructions are in OpStar. I don't understand your explanation that "you were never instructed in advance to avoid the problem"??
>
> Is there some misunderstanding between a low value dutiable item, and a document?
>
> This shipment has a document service type and an item description as documents, why would it not have been tagged as a document?
>
> Given that there have been several errors of this nature to London, and the fact that we have been warned repeatedly by UK Customs, why would this not have received additional attention? If there was some confusion, was there a call made to someone in New York for help?
>
> Did you personally review the shipment prior to tender?

(Pl.'s Ex. 5.) This email illustrates Mr. Connolly's frustration over the repeated problems concerning VEX tags. It also demonstrates Mr. Connolly's dismay over Mr. Vercelli's failure to attend to instructions for correcting the repeated errors in the D.C. office. Within days of writing

---

[2] Specifically, Mr. Connolly repeatedly communicated with Mr. Vercelli about his responsibility to check each VEX tag for shipments to London before it left the office. Instead, Mr. Vercelli delegated this responsibility to a dispatcher without informing Mr. Connolly.

this email, Mr. Connolly decided to terminate Mr. Vercelli's employment. Thus, the evidence indicates that Mr. Connolly, the person who hired Mr. Vercelli, supervised Mr. Vercelli, and is responsible for terminating Mr. Vercelli, was not satisfied with Mr. Vercelli's job performance at the time of the termination.

Mr. Vercelli argues that he met World Courier's legitimate expectation because he was *qualified* for the station manager position. Mr. Vercelli supports his qualification argument on the basis that (1) he was promoted into the position; (2) he was successfully performing the vast majority of the required functions in a competent manner; (3) the only criticism of Mr. Vercelli's performance related to the international shipments from which he had not been trained yet; (4) he was awarded a $5,000.00 bonus in 2010, the largest he ever received; and (5) he had not been disciplined or put on any kind of performance improvement plan prior to being terminated from employment.

Mr. Vercelli's arguments are misplaced. First, Mr. Vercelli may have possessed the qualifications for his promotion to a managerial position. But the record does not show a direct relationship between Mr. Vercelli's qualifications and World Courier's reason for firing him. Second, Mr. Vercelli may have successfully performed the vast majority of the required functions in a competent manner, but he failed to perform some of his managerial responsibilities. For example, there were repeated problems with VEX tags on shipments from the D.C. office to London which affected World Courier's operation. Third, Mr. Vercelli argues that he did not receive proper training on the software packages used in international transactions; however, his assertion of lack of training could be an explanation of his failing performance. But his explanation cannot help to establish that his job performance met his employer's legitimate expectations.

Fourth, Mr. Vercelli asserts that a $5000.00 bonus he was given in February 2010 is evidence that he met his employer's legitimate expectations. But Mr. Vercelli cannot explain why he received the bonus. Additionally, Mr. Vercelli received the bonus before his failure to participate in training about international packages and the subsequent April 5, 2010 incident. Thus, receiving a bonus does not support Mr. Vercelli's argument that he met World Courier's legitimate expectations at the time of his employment termination.

Finally, Mr. Vercelli contends that he had not been disciplined or put on any kind of performance improvement plan prior to being terminated from employment. However, Mr. Vercelli presents no evidence that World Courier has a policy that requires the company to place an employee on a performance improvement plan prior to firing that person. Moreover, the emails discussed above indicate that there was a serious performance issue that Mr. Connolly repeatedly communicated to Mr. Vercelli. Mr. Connolly also advised Mr. Vercelli on how to improve his performance. In sum, Mr. Vercelli cannot establish a *prima facie* case for the claim of age discrimination because he cannot show that he met World Courier's legitimate performance expectations at the time of his termination.

*2. Mr. Vercelli Fails to Prove World Courier's Nondiscriminatory Reason for the Termination is Pretextual*

Even assuming that Mr. Vercelli established a *prima facie* case, the Court grants World Courier's Motion for Summary Judgment because Mr. Vercelli cannot prove by a preponderance of the evidence that World Courier's reason for the adverse employment action was pretextual. World Courier has articulated a legitimate, nondiscriminatory reason for terminating Mr. Vercelli's employment: Mr. Vercelli's poor job performance. Specifically, under Mr. Vercelli's supervision, the D.C. office was responsible for several errors with international shipments, which affected World Courier's operation. Yet, Mr. Vercelli repeatedly ignored Mr. Connolly's

instructions for fixing this type of error. As such, World Courier met its burden of production by articulating a legitimate, nondiscriminatory reason for terminating Mr. Vercelli's employment.

Mr. Vercelli cannot establish that World Courier's reason for his termination was pretextual because Mr. Vercelli cannot show that between his age and World Courier's reason for the termination, age was the more likely reason for the dismissal, or that World Courier's proffered explanation is simply not credible. Specifically, Mr. Vercelli presents no evidence demonstrating that age was a factor in World Courier's decision to terminate his employment. Additionally, the fact that the same person who allegedly discriminated against Mr. Vercelli is the person who hired him sixteen months earlier supports World Courier's argument that its nondiscriminatory reason for the termination is not pretextual.

### a. *Age Was Not a Factor in Mr. Vercelli's Termination*

Here, Mr. Vercelli cannot show that between his age and World Courier's reason for termination, age is a more likely reason for the termination. Nor can Mr. Vercelli show that World Courier's reason is unworthy of credence. No evidence suggests that Mr. Vercelli's termination is the result of any discriminatory animus related to his age. In fact, Mr. Vercelli acknowledges that he has no facts or reasons that cause him to believe that age was a factor in Mr. Connolly's decision to terminate his employment. Specifically, according to Mr. Vercelli, age was never part of the conversation between him and Mr. Connolly. Nor did Mr. Vercelli hear Mr. Connolly say anything about anybody else's age. Additionally, age was not a part of the discussion when Mr. Connolly hired or fired Mr. Vercelli. Moreover, there is no evidence to indicate that age was the reason Mr. Connolly hired Mr. Manbodh to replace Mr. Vercelli.

However, the evidence supports World Courier's explanation for terminating Mr. Vercelli's employment. As discussed above, there were repeated operational errors concerning international shipments to London that originated from the D.C. office. Mr. Connolly, who supervised Mr. Vercelli, was not satisfied with Mr. Vercelli's performance because Mr. Vercelli ignored Mr. Connolly's instructions to fix these problems and improve the performance of the D.C. office. Therefore, Mr. Vercelli cannot prove that between age and poor performance, age was likely the reason for his firing. Nor can Mr. Vercelli establish that World Courier's reason is not credible.

Mr. Vercelli argues that (1) the demographics of the station managers at World Courier and (2) Mr. Connolly's rejection of Mr. Vercelli's request to continue to work for World Courier as a driver support the proposition that age was a factor in his firing. Mr. Vercelli presents no authority suggesting that demographics itself is indicative that an employer is acting with discriminatory animus. Additionally, Mr. Vercelli fails to point to any policy of World Courier that allows it to offer a subordinate position in lieu of terminating an employee.[3] In sum, Mr. Vercelli cannot demonstrate by a preponderance of the evidence that World Courier's reason for terminating him is pretextual.

### b. The Person Who Hired Mr. Vercelli Fired Mr. Vercelli Sixteen Months Later

Additionally, the Court's ruling in favor of Defendant is supported by the fact that Mr. Connolly is the same person that hired Mr. Vercelli then fired him sixteen months later. In *Proud v. Stone*, the United States Court of Appeals for the Fourth Circuit addressed the "relevance of the fact that the employee was hired and fired by the same person within a relatively short time span." 945 F.2d at 798. The *Proud* court held that, "employers who

---

[3] Mr. Vercelli only knew a female station manager at World Courier who voluntarily decided to step out of the station manager job and to accept a subordinate job. However, a station manager's voluntary demotion is irrelevant to Mr. Vercelli's argument, which relates to a termination of employment.

15

knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Id.* Courts in this District have relied on *Proud* in discrimination cases. *See, e.g., McDonald v. Loudoun Cnty. Bd. of Supervisors*, No. 1:10cv449, 2011 WL 3951621, at *4 (E.D. Va. Sept. 6, 2011) ("There is a strong presumption that [defendant] would not hire somebody in [p]laintiff's protected class only to discriminate against him at a later date"). Moreover, the inference of *Proud* is also applicable in an employment age discrimination case where there was a seventeen-month interval between hiring and firing of the plaintiff. *Ilozor v. Hampton Univ.*, No. 4:06cv90, 2007 WL 1310179, at *8 (E.D. Va. May 3, 2007).

In this case, when hiring Mr. Vercelli as station manager in 2009, Mr. Connolly was aware of his age. Fourteen months later, in April 2010, Mr. Connolly decided to fire Mr. Vercelli. Mr. Vercelli was then terminated in June 2010, sixteen months after he was hired as a manager. No evidence suggests that anyone in World Courier other than Mr. Connolly took part in the personnel decision to fire Mr. Vercelli. Because Mr. Connolly both hired and fired Mr. Vercelli within a reasonably short time period, he is not a credible target for charges of pretextual firing. *See Proud*, 945 F.2d at 798. Thus, it is reasonable to infer that World Courier's stated nondiscriminatory reason for acting against Mr. Vercelli is not pretextual. Moreover, Mr. Vercelli presented no evidence to overcome this inference. Therefore, even if Mr. Vercelli had established a *prima facie* case, he fails to prove by a preponderance of the evidence that Defendant's reason for the adverse employment action was pretextual.

## IV. CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Defendant World Courier's Motion for Summary Judgment is GRANTED.

The clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this 10th day of August, 2012.

Alexandria, Virginia

8/10/12

/s/
Gerald Bruce Lee
United States District Judge